Our second case for the morning is Palmer v. Saul. We'll give counsel a minute to get to the table. Mr. Sutterfield, good morning. Good morning, Your Honor. I'm Attorney David Sutterfield. On behalf of the appellant and the plaintiff in this matter, John Palmer, please support and please counsel. Your Honor, this matter is before this court for reasons that the administrative law judge's RFC determination is essentially made out of whole cloth. We have an oblique reference to a single clinic note with his primary doctor pertaining to his peripheral neuropathy, which bluntly is what drives this case. It affects his hands, it affects his arms, it affects his legs, it affects his feet. Therefore, it affects his ability to stand, walk, rise from a chair, get from a standing position back into a chair, and to manipulate objects, all things that are critical to the ability to work. What can he do sitting down? What could he do sitting down? Yeah, as far as work and whatever. Well, I think the issue, irrespective of what could he do, the question is how long could he do it for? Because, yeah, the employer's going to pay these people to work for eight hours a day. They expect eight hours worth of work and they expect eight hours worth of production in that time. And if you'll note in the testimony from the V, there's testimony about, you know, allowance for off-task behavior and things of that sort. In fact, she eliminated some of the jobs because of the changing positions, and the judge is hypothetical. So I don't think what kind of jobs he could do. Unskilled would be presumptive. But the question is can he sustain it? And our position is clearly he could not, and if the judge had fairly looked at the evidence, then he would have come up with an RFC and would have discussed the evidence that would have eliminated the ability to sustain that kind of work. In this instance, we have an individual who reported to his doctor having fallen within two weeks while not doing anything else concurrently, meaning all he was doing was walking. He wasn't sweeping. He wasn't walking a dog. He was simply walking and went down twice two weeks before the hearing. But to the extent that the ALJ said that he was going to have to avoid hazards, he couldn't climb, you know, he had to limit postural activities, that is accounting for the neuropathy, correct? Well, that becomes interesting. Where does that come from? Because what we have, again, as I indicated, he obliquely looks at a single clinic note. He looks at the one from May of 2014 where he talks about, oh, and he talks about the difficulty with his feet. Well, guess what? In March of 2013, the doctor is saying, hey, you've got this major problem with your feet. You either need to go to the Department of Rehabilitation or to Social Security Disability. So the judge completely ignores that, and he ignores the evidence thereafter. The key to the evidence he ignores thereafter, if the court recalls, is the fact that he has sent to Dr. Fortin, a neurologist, to get a workup on this. This is two years, actually 30 months, after the state agency doctor examines him, finds that he has lost the position sense with his right foot and numbness in both feet, no sensation there. And those notes are, there's two different people mixed in. But counsel, the question is whether it's supported by the record, and the ALJ did account for that. Is your position that the neuropathy necessarily means that there's no job that he could do, that sitting won't take care of it, and that avoiding situations in which the neuropathy might cause a fall doesn't take care of it? What he doesn't account for is sustainability. I mean, everybody can sit to some extent unless they have some really profound impairments. The issue is, can you do it competitively? And if you're up and you're down, and what nobody asked him is, when you're down, they asked him in his hearing, nobody asked him, well, where are your feet? And I run counter to that all the time while I sit down. When you sit, where are your feet at? Go sit in my recliner. Well, where are your feet at? Well, they're up. Well, no employer's going to tolerate that. You agree? Oh, yeah. Well, then that's not how you communicate how you're actually spending your time. Nobody actually asked this gentleman, what do you do to help control your pain? They said, here's your medications, et cetera. But for some reason, nobody asked him that. And when you look at the records, he's got profound neuropathy, very profound. If you look at the one record from Dr. Fortin where it's mixed with somebody else, that would essentially seem like it eliminates work. He's got loss of sensation, loss of reflexes in multiple places, in both arms and both legs. But he responded to the pinprick tests, right? I'm sorry? Didn't he respond to the pinprick tests that he had sensation? He did on that, but, again, the polyneuropathy widespread was the issue, was the diagnosis. But, again, what you have to look at in this is sustainability. And where does it come from? And I think that becomes problematic when you see that the judge, again, mentions a single clinic note and doesn't sort out the confusion from Dr. Fortin. He just picks and chooses from Dr. Fortin's notes as he likes. So we don't have that any solid medical basis. From there, he goes through, and I set a chart forth in my brief, where he comes up with, of the 19 functional findings that he made, seven of them are distinctly unique from the two state ACC consultants. And then 10 of the 19, there's a conflict between the two consultants. One says this, one says that. And the judge just picks and chooses between them. How do you do that when you look at a single clinical record dealing with neuropathy? And the other record you look at is confused. How do you do that? And I don't think you can do that. That's not substantial evidence. That's the judge sitting there at his loom weaving an RFC, and that's not appropriate. That's exactly what happened. I'm sorry, you asked a question? No, no, no. You seemed like you wanted to talk instead. Okay. I'm sorry. Go ahead. All right. If you have questions, I do want to address them. But that is the issue in this, is that he, out of thin air, comes up with this. That is the principal driving issue. You also have the situation where how does he arrive at the determination that alternating between sitting and standing for 30 minutes is somehow a cure-all? Where does that come from? How do you do that when you don't look at the medical? And he did not look at the medical. I mean, he clearly did not. Those are the issues that really drive this case. You have the misstatement of his activities. He equates those activities as something that's consistent with sustaining work, and they're not remotely close to sustaining work. This court has routinely said those type of activities are not consistent, not when you do them for short periods. What such activity are you referring to? Well, in this instance, we have he cited that he drives a car, but omitted the testimony he drives once a week to a gas station one block from his home. That tells you a lot about his ability to walk if he's driving a lot. He goes one week to the gas station and only drives that much? Right. The car is used universally in the house. Oh, okay. He's not going there. Other people are driving it then. Right. He's going there to get soda or something on that order. The shopping activity is limited twice a week for 15 or 30 minutes at a time. He's fished three times since June of 2014 at a hearing that was held in 2016. Okay. And he didn't go alone. He only went when other people invited him. And we don't know what he did when he got home, but he didn't bother to ask, okay, so when you got home, what impact did that have on you? Did you walk from here to the bench to sit in a lawn chair on the edge of a pond? Or how did you do this activity? It's not developed at all, and it's not something that even begins to rise to substantial gainful activity or substantial evidence. Do you want to save time for rebuttal, Counsel? I will. Thank you. Thank you. Ms. Sweet? Did I pronounce that correctly? That's okay. Thank you. Good morning, Your Honors. May it please the Court, Judy Tsui, on behalf of the Commissioner of Social Security. I'd like to begin by addressing some of the points brought up by Appellant's Counsel today. So first, Mr. Sutterfield argues that the sit-stand limitation was not adequately explained by the ALJ. This is incorrect. The ALJ's residual functional capacity analysis expressly referenced Mr. Palmer's hearing testimony that he did not believe he could perform a job requiring him to sit all day because extended periods of sitting would cost his feet to go numb. The ALJ also recounted Mr. Palmer's testimony that he alleviated this numbness by getting up to increase circulation. The ALJ further referenced the fact that when initially asked if he could perform a job with a sit-stand option, Mr. Palmer did not definitively rule it out. The ALJ clearly tied this section of the RFC to Appellant's own statements of his capabilities. Therefore, the ALJ committed no reversible error in formulating that limitation. However, even if, as Appellant's Counsel suggests, the ALJ did err by deciding it was 30-minute intervals, this error would have been harmless. During the administrative hearing, the V.E. actually testified that if an additional limitation were added, that would allow the Appellant to, quote, get up as needed and walk around for a minute or two. There were still representative jobs the Appellant could perform, which collectively represented more than 102,000 jobs in the national economy. So turning back to the ALJ's decision as a whole, Your Honors, this is a case in which the ALJ adopted each and every specific functional limitation opined by any medical source on the record. In addition, the ALJ actually adopted additional functional limitations over and above what any medical source had put forth. Was the sit-down, stand-up sit-down, is that what they referred to? Yes. When Mr. Palmer has the ability to alternate between sitting or standing at 30-minute intervals. So that's sort of a remedy. A lot of people have jobs where you sit a long time and they should get up and walk around probably. I don't know to what extent that standing is remedies, whatever the problem is, just sitting down. Is that what that means, that stand-up sit-down? Yes, Your Honor. And that's tied, again, to the Appellant's own testimony at the hearing that when his feet go numb from extended periods of sitting, how he relieves that is to stand up. For how long does it take for the numbness to go away if it does? The Appellant did not actually specify during the hearing. But again, the VE did testify that even if an additional limitation were added and it wasn't just the 30-minute intervals, if the hypothetical individual were able to get up as needed. So that individual would still have jobs they could perform. And the sit-stand limitation was how the neuropathy was accommodated? Not only that, yes. Definitely that was one of the main things. But also, as you had mentioned before, the restriction from climbing ladders or scaffolds, other postural activities, including balancing to only occasional. There was a restriction from hazards. So there were many functional limitations that the ALJ did incorporate into the RFC specifically to address the neuropathy. It just reminds me, when you get old like me, sometimes you have to follow those same principles. Balance is always a factor, I guess. Can you talk about the pain and the concentration issues that flowed from that? Absolutely, yes. So, Your Honors, the ALJ did add a restriction to simple and repetitive tasks with little to no change in workplace activities. And that was in order to address the appellant's testimony at the hearing, that his fatigue and pain would cause him to have trouble sometimes being on task. So that, again, is tied to the appellant's subjective allegations. The ALJ credited that and included this limitation to address it. And I will emphasize, too, that in this case, there is no mental impairment alleged. The appellant did not see mental health professionals. No one is saying that he has an objective problem with attention and concentration. But the ALJ added this out of an abundance of caution to make sure that it was accommodated. How does the strength finding, the 5.5 versus the 4.5, affect the neuropathy? I'm not sure that it necessarily affects the neuropathy, but it just shows that this appellant, although he is limited in many ways, still has these strength findings that are fairly normal. Yeah, that he can still use, even though there are circulation difficulties, he still retains some of the use of his extremities. Absolutely, yes. And I would go back. In addition to the appellant's testimony that we've talked about here, the ALJ also considered other evidence, and opposing counsel has referenced again and again. He referenced one clinical note, and that's simply not true. The ALJ has referenced many pieces of evidence in the record, including the consultative examination by Dr. Chapa, and other findings throughout the appellant's medical record. So it is not based on one examination finding. It is really an examination of the longitudinal record that he relied upon here. Thank you. Unless your honors have any further questions, we would ask that you affirm the ALJ's findings. Thank you, Ms. Sweigh. Thank you. Mr. Sutterfield, rebuttal. Thank you. With regard to the sit-stand, I certainly don't see it in a decision where he takes the claimant's testimony and determines that alternating between sitting in a stand every 30 minutes is somehow satisfactory. There's no time limit from the claimant's testimony as to how long he can do any of these particular activities. Again, it's created out of whole cloth. And doing that, that's not harmless error. In terms of on the strength issue, I would direct the court this peripheral neuropathy is not a strength issue, per se. In this instance, it's a pain issue. He's taken 100 milligrams of tramadol four times a day at times. Tramadol is an opioid. He's got significant pain. The issue, again, is sustainability. Having strength on one occasion or multiple occasions does not equate to the ability to do that throughout the day because of the onset of pain. And this individual clearly has that. He's on, again, very powerful medications for that. So that's not accounted for. Those are the biggest issues that I have is that that needs to be accounted for as pain. It's not a strength case. It's a pain case. Thank you, Counselor. The case is taken under advisement.